* * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman with minor modifications.
 * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The injury in the above referenced matter occurred on November 14, 2001.
2. At the time of the injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
3. At the time of the injury, the employer-employee relationship existed between the employee-plaintiff and the employer-defendant.
4. That on such date, Hollar Greene Produce Company employed three or more employees.
5. Defendants accepted this claim as compensable and provided medical treatment and wage compensation to employee-plaintiff.
6. On February 5, 2003, employee-plaintiff entered into a clincher agreement with defendants. Pursuant to this agreement. employee-plaintiff was paid $75,000. Employee-plaintiff was not represented by counsel at the time of the clincher agreement.
7. The employee-plaintiff's average weekly wage was $750.00 and his compensation rate was $500.03.
8. The clincher agreement was approved by the Industrial Commission by Order Approving Compromise Settlement Agreement filed February 25, 2003.
9. Travelers Insurance Company was the carrier on the risk.
In addition, the parties stipulated into evidence the following:
1. Packet of medical records, reports and statements.
2. Compromise settlement agreement with letter of transmittal and attachments.
The Pre-Trial Agreement dated March 27, 2006, which was submitted by the parties, is incorporated by reference.
 * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 3 
1. Plaintiff, who was fifty years old at the time of the hearing before the Deputy Commissioner, and a high school graduate, worked as a long distance truck driver from the time he was sixteen years old until the injury giving rise to this claim. As of November 19, 2001, he had been employed by defendant-employer for more than one year as a truck driver. He sustained a compensable back injury on that date when he stepped out of his truck onto the fuel island at a truck stop and slipped. In an effort to keep from falling completely down, he grabbed the truck and tried to catch himself with his other foot, but he almost did a split.
2. The following day plaintiff sought treatment at an Urgent Care Center in Elizabeth City. He already had radicular symptoms in his left leg at that time. On November 21 and 24, 2001, he went to the emergency rooms in Galax, Virginia and in Mount Airy and he then saw Dr. Keeling on December 4, 2001. Dr. Keeling ordered an MRI, which the doctor did not believe showed a surgical lesion, so plaintiff was treated conservatively with medication and physical therapy. However, he remained symptomatic despite the treatment and Dr. Keeling subsequently referred him to Dr. McWhorter, an orthopedic surgeon, for evaluation. Dr. McWhorter's physician's assistant examined plaintiff on February 19, 2002. By that date, plaintiff's back pain had subsided but he was having constant radicular symptoms in his left leg. Since the MRI report did not disclose a surgical lesion, no surgery was recommended despite the radicular symptoms.
3. Dr. Keeling then referred plaintiff to Dr. Pool, a neurosurgeon, who examined him on March 19, 2002. Dr. Pool apparently reviewed the actual MRI films, which showed a higher level in the spine than was discussed in the radiology report for the test, and he diagnosed plaintiff with a disc herniation at L3-4. There appeared to be impingement of the left L4 nerve root at that level. Since plaintiff's symptoms had not improved with conservative treatment, Dr. *Page 4 
Pool recommended surgery to decompress the L3-4 interspace, and he subsequently performed that operation on April 16, 2002.
4. Following the operation, plaintiff initially did well but he began to have recurrent leg pain several weeks later. Dr. Pool and his partner, Dr. Cram, prescribed medications for him and in June epidural steroid injections were ordered. After three injections plaintiff was still having left leg pain, but his symptoms were more consistent with an L5 radiculopathy rather than problems with the L4 nerve root. Dr. Pool concluded that the stenosis at L4-5 had been aggravated by the post-operative rehabilitation and the doctor recommended surgery to decompress that level. On August 27, 2002 the doctor performed that operation and also re-explored the L3-4 interspace.
5. As with the first surgery, plaintiff reported initial relief of his leg pain, but on September 17, 2002, he went to the emergency room after experiencing a popping sensation in his back followed by severe low back pain as well as decreased sensation in his left leg. The MRI performed that day showed evidence of a possible seroma or spinal fluid leak at L3-4 and a possible disc protrusion with no clear nerve root compression at L4-5. Consequently, he was treated with steroids and other medication. His symptoms improved by his follow-up appointment with Dr. Pool on September 26, 2002 but he again began to develop increasing radicular symptoms in his left leg, so the doctor ordered a myelogram/CT scan which was performed on November 11, 2002.
6. After reviewing the films, Dr. Pool concluded that the common dural tube had herniated through the surgical site and had become twisted so that there was tension on the nerve root. This was a very unusual finding and, in the doctor's opinion, required surgery from the opposite side so that the spinal sac could return to its central location. Dr. Pool performed the *Page 5 
surgery on November 26, 2002. The operation was complicated by a laceration to the dura, which caused a spinal fluid leak. However, plaintiff did subsequently improve after this third operation without developing recurrent symptoms.
7. At the January 7, 2003 follow-up appointment with Dr. Pool, plaintiff advised that he was anxious to get this episode behind him and he inquired as to whether it would be reasonable to close out his case at that time. He was particularly interested in what restrictions he would have, but it was his impression that he would be able to return to work as a truck driver. Dr. Pool agreed with him as long as he would only drive and not do the loading and unloading required of some truck drivers. The doctor gave him thirty-pound maximum lifting restriction and advised him to avoid repetitive bending, lifting or twisting. Dr. Pool also rated him with twenty-percent permanent partial impairment of the spine.
8. Defendants admitted liability for benefits under the Workers' Compensation Act for the injury in question pursuant to a Form 60. After receiving the medical report for the January 7, 2003 appointment, the insurance adjuster for the workers' compensation claim, Patti Burk, wrote plaintiff on January 28, 2003 to advise him regarding the options for his claim. By that date, she had determined that his employer would not be able to accommodate the doctor's restrictions. She told him that he could have vocational rehabilitation with job placement assistance or that defendants would be willing to enter into a final settlement of his case for $75,000.00, an amount which she said included $30,000.00 for the impairment rating, approximately $20,000.00 to cover potential future medical expenses plus $26,000.00 to cover possible disability for fifty-two weeks.
9. Plaintiff was anxious to return to work and felt that he was able to resume work as a truck driver, but he took Ms. Burk's letter to Dr. Pool and discussed the settlement offer with *Page 6 
him in order to assess his risks because he understood that the settlement would be final and that, if he accepted it, defendants would no longer pay for medical treatment or compensation for disability. Dr. Pool could only tell him what the probabilities were of his needing more treatment, but at that time it appeared likely that he would only need occasional anti-inflammatory medication for his back condition. The offer appeared fair to both Dr. Pool and plaintiff, so plaintiff contacted Ms. Burk and accepted it. Defendants then had their attorney prepare a compromise settlement agreement. At plaintiff's request, the agreement was not mailed to him. Rather, he went to defense counsel's law office, reviewed it there and signed it. The agreement was then sent to the Industrial Commission for review, and by order filed February 25, 2003 the settlement agreement was approved.
10. In the next month, plaintiff worked for two other companies, but he was not satisfied with those jobs and quit. He then bought his own truck and drove it as an owner-operator. He did not have significant problems with his back but by later that year began to experience soreness between his left hip and leg. The pain became significant in early January 2004. One day that month, he stopped in Texas to fuel his truck and was unable to climb back into the cab due to leg and hip pain. He called his wife, who made an appointment with Dr. Pool. Despite his symptoms, he was able to complete his run to California.
11. Plaintiff saw Dr. Pool on January 16, 2004 after he returned from his trip. The nature of his symptoms on that occasion was such that the doctor ordered an MRI of his hips as well as of his lumbar spine. There were no new structural problems shown in his spine, but the MRI of his hips showed that he had bilateral avascular necrosis, a condition caused by loss of blood supply to the hip joint which causes the bone to deteriorate and die. The condition in his left hip was advanced to the point that there was partial collapse of the femoral head. *Page 7 
Consequently, Dr. Pool referred him to Dr. Aluisio, an orthopedic surgeon, for treatment of his hip problem.
12. Dr. Aluisio evaluated plaintiff on January 29, 2004. By that time, plaintiff could not bear weight on his left leg. The only effective treatment option was hip replacement surgery, so on February 16, 2004 Dr. Aluisio performed surgery to replace plaintiff's left hip. Following the operation, plaintiff did very well and he was walking normally by April 13, 2004. However, the symptoms in his right hip were increasing at that time due to further progression of the avascular necrosis in that joint, so he was ready to consider surgery on the right side. On April 26, 2004 Dr. Aluisio operated to replace his right hip joint.
13. Plaintiff did not do well after the second hip operation and had problems with his right hip dislocating. He had to go to the emergency room on several occasions due to problems with his right hip. Consequently, Dr. Aluisio performed another operation on May 27, 2004 to revise the liner in that hip. Following that procedure, the hip felt more stable but plaintiff continued to experience problems with it until the date of hearing. He had difficulty sitting or standing for a long periods, could not climb a ladder and otherwise had had to limit his activities. Dr. Aluisio indicated that plaintiff would not be able to return to work as a long distance truck driver.
14. Both Dr. Pool and Dr. Aluisio advised plaintiff that the probable cause of the avascular necrosis in his hips was his use of steroid medications for his back injury. Since a compromise settlement agreement had been approved in the case, defendants understandably refused to pay for his hip surgeries or to provide further workers' compensation benefits. Plaintiff then requested a hearing and asked that the compromise settlement agreement which had been approved in this case be set aside on the basis of mutual mistake. *Page 8 
15. According to the records from Eckerd's pharmacy, plaintiff was prescribed five steroid dose packs between November 30, 2001 and October 11, 2002. He also received Decadron injections at multiple emergency room visits and after his three back operations during that period. He clearly had multiple exposures to high levels of corticosteroid medications and there was no evidence that there were other risk factors for avascular necrosis involved in his case. His bilateral avascular necrosis was therefore a probable result of the injury by accident giving rise to this claim.
16. As a neurosurgeon and not an orthopedic surgeon, Dr. Pool did not consider himself to be an expert on avascular necrosis, although he was aware of the risk of developing the condition associated with use of corticosteriods, which had been known for decades. Dr. Aluisio indicated that the avascular necrosis found in plaintiff's hips in January 2004 could have been present for six months or up to two years, but there was no way to know how long it had been there because progression of the condition varied from patient to patient, although once started it usually developed rather quickly. However, the condition does not develop immediately after steroid use. Consequently, the Full Commission finds as fact that there was no way to know whether the avascular necrosis actually existed in plaintiff's left hip in February 2003 when the compromise settlement agreement was entered into in this case.
17. The parties were unaware of plaintiff having avascular necrosis in February 2003. However, the risk of his requiring further medical treatment for his back condition was clearly contemplated by plaintiff and Ms. Burk. In fact, significant compensation was included in the settlement amount in order to address the risk of further medical treatment. Roughly a year of temporary total disability compensation was also included in the settlement amount. Each party recognized that there were uncertainties regarding plaintiff's future condition and they were *Page 9 
taking their chances that the future would bring either significantly greater or less compensation than that being paid to resolve the case.
18. The compromise settlement agreement approved in the case was fair and was properly approved.
19. Plaintiff did reach maximum medical improvement with respect to the injury giving rise to the claim as of January 7, 2003, as of the date Dr. Pool released him and plaintiff had experienced no further back problems which required medical treatment after that date through the date of hearing before the Deputy Commissioner. When the settlement agreement was signed and approved, there was no mistake as to whether plaintiff had reached maximum medical improvement.
20. As of January 16, 2004 plaintiff sustained a material change for the worse in his condition when he required medical treatment and became unable to work due to symptoms from avascular necrosis, a condition which was causally related to his injury at work but which had not manifested itself until late in 2003. At the time the compromise settlement agreement was executed, the parties could not have known that plaintiff would have developed this condition, since it was a future complication and they therefore did not contemplate any consequences from the condition, which was unknown and may well not have been present at any stage, in arriving at a settlement amount.
21. Although Dr. Pool's testimony indicated that he was mistaken with regard to his opinion that plaintiff was at maximum medical improvement, the greater weight of the evidence shows that plaintiff's compensable injury had resolved at that time. The subsequent development of avascular necrosis was an unforeseen complication of plaintiff's original injury. *Page 10 
22. The evidence did not establish that plaintiff actually had avascular necrosis in February 2003 when the compromise settlement agreement was approved. The presence of avascular necrosis was therefore not an existing fact at that time.
23. There was no evidence that the compromise settlement agreement at issue was entered into because of error due to fraud, misrepresentation or undue influence.
24. The compromise settlement agreement approved in this case was not entered into due to the parties' mutual mistake regarding an existing fact.
 * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. A settlement agreement which has been approved by the Industrial Commission is as binding on the parties as an unappealed award of the Commission, and it cannot be set aside unless there was an error due to fraud, misrepresentation, undue influence or mutual mistake. N.C. Gen. Stat. § 97-17; Pruitt v. Knight Publishing Company, 289 N.C. 254 (1976).
2. In that mutual mistake must relate to an existing or past fact and in that the avascular necrosis with which plaintiff was subsequently diagnosed was not an existing fact in February 2003 when the compromise settlement agreement was executed and approved in this case, he is not entitled to have the agreement set aside on the basis of mutual mistake. N.C. Gen. Stat. § 97-17; Caudill v. Chatham Manufacturing Company,258 N.C. 99 (1962).
3. Although a compromise settlement agreement can be set aside when the parties are mistaken with regards to whether plaintiff has reached maximum medical improvement, the mistake must be existing at the time the compromise settlement agreement is executed. Roberts *Page 11 v. Century Contractors, Inc., 162 N.C. App. 688, 592 S.E.2d 215 (2004). Although in this matter plaintiff suffered additional complications from his injury, there was no mistake as to an existing fact at the time of settlement.
4. Accordingly, since there was no error due to fraud, misrepresentation or undue influence and since the circumstances of this case did not establish a mutual mistake of existing fact, the parties are bound by the compromise settlement approved in this case. N.C. Gen. Stat. § 97-17; Pruitt v. Knight Publishing Company, 289 N.C. 254 (1976);Caudill v. Chatham Manufacturing Company, 258 N.C. 99 (1962).
 * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for further workers' compensation benefits is hereby DENIED.
2. Each side shall pay its own costs.
This the ___ day of May, 2007.
 S/_______________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
S/_______________ LAURA KRANIFELD MAVRETIC COMMISSIONER. *Page 12 
S/_______________ CHRISTOPHER SCOTT COMMISSIONER.